CRANSTON PRINT WORKS COMPANY,
a corporation, Appellee,

v.

PUBLIC SERVICE COMPANY OF
NORTH CAROLINA, Inc.,
Appellant.

No. 8226.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 16, 1961.

Decided June 8, 1961.

Clarence N. Gilbert, Asheville, N. C. (Horner & Gilbert, Asheville, N. C., on brief), for appellant.

Herbert L. Hyde, Asheville, N. C. (Van Winkle, Walton, Buck & Wall, Asheville, N. C., on brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

Cranston Print Works, a Rhode Island corporation, with principal offices in that state, hereinafter referred to as Cranston, brought this tort action in the District Court for the Western District of North Carolina against Public Service Company of North Carolina, Inc., hereinafter referred to as Gas Company or

defendant, to recover damages to Cranston's boiler house and equipment claimed to have resulted from an explosion of natural gas. Jurisdiction was grounded upon diversity of citizenship. This appeal followed a jury verdict and judgment thereon in favor of Cranston.

In its complaint, Cranston claimed damages resulting from specific acts of negligence on the part of the Gas Company, such acts allegedly being the sole, proximate and exclusive cause of the explosion. It was alleged that the defendant kept explosive gas in old, broken and rusty equipment on Cranston's property, that it permitted a high pressure to build up in the line, that it failed to warn Cranston of the weak and highly dangerous condition of the gas installation, that it failed to make proper inspection of the gas line and equipment and that it permitted its gas to escape and explode.

At the close of the plaintiff's evidence, defendant moved for dismissal on the ground of insufficient evidence, which motion was denied. The only evidence offered by the Gas Company was a written contract providing for the sale by it and the purchase by Cranston of gas on an interruptible basis, which contract was admitted over the objection of Cranston. At the conclusion of all the evidence, the defendant again moved to dismiss and for judgment in its favor, which motion was again denied, and the court proceeded to submit the case to the jury. Two issues were framed and submitted for jury determination as follows: (1) Was the plaintiff's property damaged, and did it suffer the losses as alleged in the complaint, by the exclusive negligence of the defendant? (2) What amount, if anything, is the plaintiff entitled to have and recover of the defendant? The answer of the jury to the first issue was "Yes", and to the second issue the jury answered "$26,268.06."

It was conclusively shown that an explosion occurred about two o'clock on the afternoon of Monday, November 11, 1957. For some time prior thereto, Cranston had operated a cloth printing and dyeing plant on its premises near Fletcher,

North Carolina, located east of the Asheville-Hendersonville Highway. A boiler house supplied processing steam required at the main plant north of the boiler house, a spur railroad track extending between the two. About 100 feet west of the boiler house was a small sheet metal building used as an incinerator for burning trash from the plant.

The boiler house, about 60 feet by 70 feet, was of brick and concrete construction, two stories in height, with concrete roof and glass windows on all four sides. The first story was less than fifteen feet high and the window sills were about four feet above the floor. Windows, having casement type openings within the sides, clear glass panes and steel frames, extended for most of the height of the second story. On each floor there were door openings on the north and west sides, each opening having double steel doors.

On the first floor there were air compressors, electric motors, two concrete ash pits, a condensate receiver tank, water pumps, steam, water, air and gas piping and electrical wiring. On the second floor were two boilers, with control panels and other auxiliary equipment. One boiler was a stoker-fed, coal-burning type; the other used natural gas when available and coal at other times.

The Gas Company furnished to Cranston natural gas for use in its main plant on a firm or noninterruptible service basis, and gas on an interruptible service basis for use as fuel for one of the boilers. A written contract executed on a yearly basis and renewed from time to time pertained to interruptible service. By the terms of a contract introduced in evidence by the defendant, it could discontinue the furnishing of gas for use in the boiler upon notice to Cranston.

■ The motion to dismiss and for judgment in favor of the defendant is the equivalent of a motion for a directed verdict. The principle has been stated again and again and is generally accepted that, upon such motion, the evidence will be

considered by the court in the light most favorable to the plaintiff. Since the defendant contends that the evidence was not sufficient to go to the jury, it is necessary that this evidence be set out at some length.

In the autumn of 1954, the Gas Company installed gas lines and equipment on Cranston's property, with lines leading to its main plant and boiler house and also to the Moland-Drysdale Brick Plant on adjoining premises about one-fourth of a mile to the southwest. The defendant's pipeline supplying Cranston and the Brick Plant originated at Kings Mountain and was tapped at a point near Fletcher, North Carolina. From this tap a 4-inch line ran to a point on Cranston's property referred to as the "primary station" about 300 feet east of the boiler house. The gas came to this station at a pressure varying from 200 to 400 pounds per square inch. At this station there was a tee in the line and two 4-inch pipes led off from this tee. In each such 4-inch line there were installed, in the following order, a cutoff valve, a regulator or reducing valve and another cutoff valve. These two 4-inch lines then came together in a common header, and from that point one 4-inch line extended to the Brick Plant approximately one-fourth mile away, and another 4-inch line went underground, passed Cranston's boiler house and emerged above ground about ten feet west of the boiler house. This point is referred to as the "secondary station." In each 4-inch line after the division at this common header, there was a cutoff valve and after this cutoff valve in the line leading to the Brick Plant, there was no other apparatus until the line reached a point near the Brick Plant where there appeared in the following order: A relief valve; a tee with two 2-inch lines leading from it; in each 2-inch line a cutoff valve, a 500 B American meter, and a regulator. These two lines then merged into a single line and entered the plant.

In the line leading to Cranston's boiler house and plant from the common header at the primary station, there appeared in the following order: A cutoff valve; a regulator; a cutoff valve; another cutoff valve and then the line went underground. The regulators mentioned were designed to reduce the gas pressure to the number of pounds per square inch at which the regulators were set and below the 200 to 400 pounds pressure at the primary station. On the day of the explosion, it was intended that the regulators should reduce the pressure to 75 pounds per square inch. The regulators at the primary station were the only ones controlling pressure on the Cranston line before the gas reached the meters at the secondary station.

After the single line supplying Cranston emerged from the ground, there was installed the cutoff valve which was mentioned in the earlier description of the line leading to the main plant. A short distance away from this valve the line diverged, with two lines passing through twin cutoff valves and into two 500 B American type meters. These meters, which were located about ten feet from the west wall of the boiler house, measured the boiler house gas. They were made of cast iron about three-eighths of an inch thick, round or cylindrical in shape, two or three feet in diameter, with flanged bolting and attachments. After the gas passed through the meters toward the boiler house, there were two cutoff valves on each line, a regulator on each line, followed by two additional cutoff valves and a riser leading into the boiler house close to the westerly wall, fitted with another cutoff valve. The Gas Company admitted that when this riser was installed, it intended to place a relief valve in it but, instead, had installed a cutoff valve.

On the day of the explosion there was no relief valve in any part of the line or lines leading from the primary station to the boiler house or to the main plant. The only such valve in any part of the lines serving Cranston and the Brick Plant was in the line to the Brick Plant and about one-fourth of a mile from the boiler house.

After the line passed through the first valve at the secondary station—and from a common header from which the boiler house lines led off through the meters—another line led to Cranston's main plant. This line, called the "firm line," did have a regulator or reducing valve in it upstream from the point where the meter measuring the gas for the main plant was located. This meter, either an 80 B or 35 B American type meter, was located two feet from the west wall of the boiler house. The door in the lower floor west wall of the boiler house was about six feet from this gas installation at the secondary station, and a window north of this door was very close to and immediately in front of said installation.

The Gas Company owned all the gas lines, valves, meters and other equipment on Cranston's property through and including the last regulators or reducing valves. The Gas Company's managing agent stated that this company had control of all this equipment through the last regulators nearest the boiler house. After the line left these regulators and entered the west wall of the boiler house, the main 4-inch line extended up to the firing line of the boiler on the second floor. Inside the boiler house, the line had installed in it, in the following order, a reducing valve or regulator, a stop valve which automatically cut off when pressure got too low or too high, another cutoff valve and a firing regulator valve, after which the line led to the header and then to the burner.

On Wednesday, November 6, 1957, the Gas Company called Cranston's plant engineer, Gaffney, and notified him to discontinue the use of gas in the boiler house at the earliest opportunity. Gaffney informed the Gas Company that the change-over would be made on the morning of Saturday, November 9, and so instructed the boiler house foreman. Normally, when Cranston was notified by the Gas Company to discontinue the use of gas in the boiler house, the two valves nearest the 500 B meters and between the meters and the boiler house were cut off. If the first valve on the main service line at the secondary station had been cut off, this would have interrupted the flow of gas in the "firm line" supplying the main plant. When a change-over from gas to coal was necessary, it was customarily made when the work load was light and the operation of one boiler would suffice, one or two days being required.

The change-over was started at eight o'clock in the morning of Saturday, November 9, 1957. The valves on the gas line inside the boiler house were cut off. The two valves between the boiler house and the 500 B meters and nearest the meters were likewise turned off thus stopping the flow of gas from this point forward to the boiler house. All other valves between this cutoff and the primary station were left open, permitting gas to flow through the "firm line" to the main Cranston plant and through the boiler house meters to the cutoff valves and through the line, valves, meters and regulators into the Brick Plant. It was the custom and practice of the Gas Company to check the gas installations of a customer who was served on an interruptible basis within a few hours after it gave notice to the customer to discontinue the use of gas in order to read the meter and to make sure that the customer had shut off the gas. After the Gas Company gave its notice on November 6 to Cranston to discontinue the use of gas and before the explosion, the Gas Company did not check its primary regulators on Cranston's property, nor did it check or inspect the meters at the boiler house or the valves where the gas was cut off near the boiler house.

On the morning of Monday, November 11, 1957, the Gas Company directed the Brick Plant, which was also on an interruptible service basis, to discontinue the use of gas and this customer cut off the gas valves inside its plant. After that time the relief valve near the Brick Plant was heard "popping off" all morning, about every twenty or thirty minutes, and until the explosion at the boiler house about two o'clock in the afternoon.

Thereafter, no further noise was heard from this valve.

On the same Monday and prior to the explosion, the Gas Company sent its employee Eason to the Brick Plant to check the meter for a reading and to ascertain whether its supply of gas had been cut off. He noted the noise from the relief valve and discovered that the valve was relieving at a pressure of 91 or 92 pounds per square inch. He then left to return to Asheville to get tools and parts, intending to return to check and inspect the regulators at the primary station on Cranston's property. The Gas Company's managing agent, Martin, admitted that Eason would have no reason to check these unless he discovered something "out of the ordinary." Before leaving for Asheville, Eason did not check these regulators, or the meters or cutoff valves at Cranston's boiler house and the damaging explosion occurred before he returned.

There was no evidence that the odor of natural gas was detected in or around the boiler house prior to the bursting of one of the large meters. A boiler house operator was at work there and from one o'clock until the time of the explosion was on the second floor. Another Cranston employee was also on duty in the boiler house. In addition, an employee of the Grinnell Company was present on the second floor at about two o'clock in the afternoon. On Saturday and Sunday he had installed a steam pressure reducing station in Cranston's main plant but he had installed nothing in the boiler house. He was there for about fifteen minutes observing the meter boards as to the amount of steam being used in the main plant. At that time both boilers were operating on coal with nothing abnormal about their operation. At about two o'clock in the afternoon, Cranston's employee Hendrix, then on the second floor of the boiler house, heard a light explosion at the west end of the boiler house. Within a few seconds thereafter he detected the odor of natural gas in the building and started toward the front end of the building to investigate. As he went toward the west

wall, glass was falling from the windows to the inside of the building and about that time a violent explosion occurred. Hendrix was knocked to the floor, got up, went to the control panel, put one boiler on hand control and disconnected the fires. He then tried to go down the west stairway which he found blocked by fire; he then tried the east stairway and, being again blocked by fire, he and two companions reached safety by leaping from the north door.

When the first light explosion occurred, Cranston's employee Mills was burning trash in the incinerator building about 100 feet southwest of the boiler house. He testified that the first explosion sounded like a big firecracker and he saw that the southernmost 500 B meter had burst. It was completely blown up and pieces flew from it. He heard a hissing sound like a big gush of air being released and then the second large meter and the "whole boiler house exploded." He testified that this explosion took place inside the boiler house. He saw one of the large steel doors on the west lower floor tear off and sail through the air landing on another building 50 or 75 feet away. He also saw glass flying. Mills saw no fire after the first explosion but saw flames after the second explosion; no window sashes were blown out across the gas lines until the second explosion occurred.

Just before the explosion Cranston's employee Bishop was standing on the loading platform of the main plant approximately 150 feet from the boiler house. He heard the first explosion and saw, on the outside of the boiler house and at the west side, what looked like thrown-up "dirt or gravel." He then heard a sound at that spot "like air or something escaping from pressure." Pieces of metal hit the wall behind him and fell down. He picked up a piece of this metal which he described as painted an aluminum color, the same as the burst meters, slightly rounded or oval, about ten inches long, two and one-half to three inches wide, and three-eighths of an inch thick. He later weighed it and found that it weighed six and three-fourths

pounds. Bishop later took this metal to the office of Gaffney, plant engineer, showed it to Gaffney and two or three other persons and left it there. Bishop saw no fire or smoke until after the second explosion, but he then saw a lot of fire inside the boiler house and coming out of the windows.

Gaffney and Branch, the boiler house foreman, examined the piece of metal which Bishop had picked up. According to the testimony, along one edge it was rusty halfway through from the outside toward the inside, and from that halfway point inward the metal gave the appearance of fresh or recently broken metal. Branch stated that metal exposed to weather would tend to rust and show age more quickly than if kept in some other place. This piece of metal was not produced at the trial and it was explained that after it had been left in Gaffney's office he later made a search for it but it could not be found.

The impact from the explosion knocked grit and dirt from overhead onto Gaffney's desk in his office at the main plant about 600 feet from the boiler house. He saw the boiler house in flames, the glass in all the windows broken out and some of the frames lying on the ground.

After the explosion flames could be seen coming up to the second floor. Cranston's employee Jones and four or five others ran from the main plant to the primary station and he could hear a loud screaming noise in the gas line at that point. With channel lock pliers he cut off one valve and the noise abated but started again "real loud." He then cut off a second valve on the same line, the noise stopped and he could then see no more fire outside the boiler house.

No apparent damage was done to the boilers on the second floor but on the first floor the paint on the compressors had been burned off, the belts on the motors and the insulation on all the steam pipes had been burned through and the electrical wiring had been twisted and blackened by the fire. Damage was done to the concrete and brick walls; two large sheet metal roof ventilators had been blown out; much of the piping was burned so that it was rendered inoperable, and the meter control boards in the boiler house were damaged by shock. At the secondary station the gas pipes and equipment were broken, distorted and bent; the two large meters were broken in pieces. The window frame on the lower floor immediately in front of the gas installation was found inside the boiler house, twisted, bulged and broken. The glass from this window was on the floor.

It was shown by the evidence that a spark from any of the electric motors on the first floor, an arc from one of these or a lamp, upon being burst by impact, could have ignited the natural gas then present in the boiler house.

As stated, the defendant offered no evidence other than the interruptible service contract with Cranston and it relied primarily upon paragraphs numbered 7 and 9 as shown below.[1]

---

1. "7. The Customer agrees to give immediate notice to the Company when any leakage of gas is discovered, with confirmation in writing, and the Customer agrees not to use any light of any character, or other igniting medium, in the proximity of escaping gas or to do or suffer to be done any act which would ignite such gas, and to shut off the flow of gas immediately. The Company shall not be liable for any damage or loss arising out of, or caused by, any leakage of gas except when due to the *exclusive negligence* or willful acts of the employees of the Company." (Emphasis supplied.)

\* \* \* \* \*

"9. The Customer further agrees that the point of delivery shall be the point where Company's service pipe crosses the boundary of Customer's property, and that the Company shall not be liable to Customer or any of his agents, servants or employees, or to any person whomsoever, for any loss, damage or injury to person or property resulting from the said gas or its use after it leaves said point of delivery, all risk thereof and therefrom being assumed by Customer, except when caused by the *exclusive negligence* or willful acts of the employees of the Company." (Emphasis supplied.)

The Gas Company contended below that this written agreement is a private contract between two corporations with equal bargaining power and that the public is not directly involved; consequently, the contract cannot be construed as being against public policy but is valid, binding and pertinent here, providing the defendant with a defense since there was no proper evidence of defendant's "exclusive negligence." The parties agreed that there was no evidence of willful acts of defendant's employees.

In his charge to the jury, the learned judge made it abundantly clear in a lengthy discussion that, to find for the plaintiff, the jury must find from the greater weight of the evidence that the explosion and damages were caused by the "exclusive negligence" of the Gas Company. Thus, in submitting the question of liability to the jury, the court accepted the view of the Gas Company that, under its contract with Cranston, it could be held liable only for damages resulting from its exclusive negligence. This limitation upon the scope of the jury's inquiry was most favorable to the Gas Company. The jury found that the exclusive negligence of the defendant was the proximate cause of the explosion and resulting damage.

The evidence consisted of the testimony of a number of the plaintiff's employees, answers to requests for admissions and to interrogatories submitted by the plaintiff to the defendant which were read to the jury, the depositions taken by the plaintiff of other witnesses including three of the defendant's employees, and the testimony of Flanders, an expert witness, who testified for Cranston.

■ Flanders testified that he was a graduate of a well known engineering school; that he had been engaged in fire protection engineering for eighteen years; that he had written articles published in trade magazines concerning fire and fuel explosion hazards and general standards for protection of gas and fuel equipment. The court found him to be an expert and, as such, qualified to express an opinion. No objection was made to the court's finding as to qualification.

This expert witness was asked three hypothetical questions which included statements of facts based upon the evidence presented by Cranston. Counsel made it clear to the witness that his answers should be based upon the assumption that "the jury should find from the evidence in this case and by its greater weight" that the facts recited in the questions were established. The first question was, "Do you have an opinion satisfactory to yourself as to whether or not the two regulators which were set at 75 pounds per square inch and appearing at the primary station described herein were functioning properly?" After answering that he did have an opinion, he stated his opinion that the regulators were not functioning properly. The second question was as follows: "Do you have an opinion satisfactory to yourself as to the cause of the eruption of the meter?" This referred to the meter which was shown by the testimony of witnesses to have first exploded. After stating that he did have such an opinion, he answered: "My opinion is the structurally defective meter was subjected to high pressure and erupted and exploded violently." The third question was, "Do you have an opinion satisfactory to yourself as to what could or might have caused the explosion inside the boiler house?" To this question he answered, "My opinion is that the natural gas escaped from the ruptured meter under high pressure, entered the boiler room where it was ignited with explosive violence." The defendant objected to each question and answer. This witness was then cross-examined by defense counsel.

The Gas Company contends that the testimony of the expert witness was inadmissible since his answers invaded the province of the jury and were addressed to the determinative and ultimate question—what was the cause of the explosion.

Federal Civil Rule 43(a), 28 U.S.C.A., provides in part as follows:

"All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made."

Gilbert v. Gulf Oil Corporation, 4 Cir., 1949, 175 F.2d 705, 709, involved a claim for damages to a warehouse resulting from an explosion while a delivery truck was supplying gasoline to a storage tank installed beneath the floor of the basement of the building. It was agreed that the explosion probably occurred by the ignition at the furnace of gasoline fumes which settled into the basement, but there was a conflict as to the reason for the presence of the fumes near the furnace and on this point differing opinions were expressed by qualified scientific experts. While the case turned on the improper admission of testimony of one witness who was allowed by the Court to express an opinion on an inadequate basis and in respect to facts which were not disclosed to the jury, this court said, at page 709:

"* * * We are in accord with the general trend of modern authority which holds that questions as to the admissibility of expert testimony should be left to the wise discretion of the trial judge. * * * But in the exercise of this discretion, the court must still determine whether the subject matter of the suit is such that the issues cannot be properly understood or determined without the aid of opinions of persons of special knowledge or experience, whether the expert offered as a witness is qualified to express such an opinion, and whether he has sufficient acquaintance with the basic facts, either through personal observation or on the basis of a proper hypothetical question, to enable him to do so. There is no question in this case that expert testimony was needed to guide the jury in their deliberations. * * *"

In Padgett v. Buxton-Smith Mercantile Company, 10 Cir., 1958, 262 F.2d 39, 41, the court, in discussing the competency of the testimony given by a qualified witness under attendant circumstances, said:

"In that respect we fully subscribe to Wigmore's theory that * * * all expert testimony is admissible if it reasonably tends to aid the trier in the resolution of the decisive issue, and is not a mere guess or conjecture. * * * Thus, we have said, in accordance with the modern trend, if the matter in dispute and to be decided involves causes and effects which are not within the knowledge or comprehension of the lay trier, expert testimony is admissible as an aid to the decisional process. And, it is not rendered inadmissible simply because it invades the province of the trier of the critical issue. * * *"

In Padgett the decision of this court in Gilbert v. Gulf Oil Corporation, supra, was cited with approval.

Cranston argues that under Rule 43(a), supra, the testimony of the expert witness was proper under cases decided by the Supreme Court of North Carolina, citing Gerow v. Seaboard Air Line Ry. Co., 1924, 188 N.C. 76, 123 S.E. 473; Horne v. Consolidated Rys. Light & Power Co., 1907, 144 N.C. 375, 57 S.E. 19; House Cold Tire Setter Co. v. Whitehurst, 1908, 148 N.C. 446, 62 S.E. 523; Frazier v. Suburban Rulane Gas Company, 1957, 247 N.C. 256, 100 S.E.2d 501. We offer the following comment as to these cited cases.

In Gerow the Court permitted an expert to state his opinion that an explosion was caused by low water in a boiler, his opinion being based upon his own personal examination and inspection following the explosion. In Horne an expert witness was permitted to testify that an electric light pole could have been placed at a greater distance from a metal awning, thus avoiding the accident, but the Court stated that the witness was, in effect, describing the place and, while expressed in the form of an opinion, he was really stating a fact. In House Cold Tire Setter, a witness having experience with machines of the same kind and make, was allowed to testify that the machine in question was unfit for its intended use. In Frazier an expert was allowed to testify as to the cause of a fire and that an adequate inspection would have revealed the defect. However, it does not appear that there was objection to this testimony.

The Gas Company indicates primary reliance upon Patrick v. Treadwell, 1942, 222 N.C. 1, 21 S.E.2d 818, 821. There a physician gave as his expert opinion that a bone in plaintiff's arm had been dislocated by plaintiff's fall from the seat to the floor of an automobile which was involved in collision with defendant's automobile. Our attention is particularly directed to the following statement of the court:

" * * * However, while the tendency is to liberalize the rule as to this class of opinion evidence, and to hold it admissible when it tends to aid the jury in the search for truth * * *, even when the opinion of the expert based upon peculiar knowledge, skill and experience is given as to the ultimate question in issue, this rule should not be relaxed to the extent of opening the door to the statement of an evidential fact in issue beyond the knowledge of the witness under the guise of an expert opinion. * * * "

But the court further stated, at pages 821 and 822:

"However, it would seem that the proper test is whether additional light can be thrown on the question under investigation by a person of superior learning, knowledge or skill in the particular subject, one whose opinion as to the inferences to be drawn from the facts observed or assumed is deemed of assistance to the jury under the circumstances. * * * Undoubtedly it would be competent for an expert witness to give his opinion as to what causes would produce the result observed, but this would not permit him to inject into the consideration of the jurors the weight of his assertion that such result was in fact produced by a particular cause. * * * "

A new trial was ordered since the court found that the evidence of the physician was addressed to the determinative question whether the plaintiff's injury was in fact caused by the negligence of the defendant, and under the facts of the case tended to give undue weight to the plaintiff's contention.

A later case decided by the Supreme Court of North Carolina, Bruce v. O'Neal Flying Service, 1951, 234 N.C. 79, 66 S.E.2d 312, 315, involved the crash of an airplane and expert opinion evidence was admitted to show the cause of the crash. The defendant there contended that the opinion testimony should have been excluded because it went to the very issue of fact before the jury, i. e., the cause of the crash. The court, in holding that the admission of this testimony was not error, quoted with approval from Patrick v. Treadwell, supra, and said:

" 'It has been frequently stated by the courts that the testimony of an expert witness should be excluded when it invades the province of the jury, or when it expresses an opinion on the very issue before the jury. * * * '

" 'But this rule is not inflexible, is subject to many exceptions, and is open to criticism. * * * '

"'* * * and it is frequently relaxed in the admission of evidence as to ultimate facts in regard to matters of science, art or skill, * * *.'"

Thus, it appears to us that the Supreme Court of North Carolina recognizes the trend toward liberalization of the rules respecting the admission of expert testimony.

In the instant case, Flanders did not undertake to express an opinion that the explosion was caused by the exclusive negligence of the Gas Company, which was the ultimate question to be decided by the jury. Even though the explosion was said to have been caused by gas escaping from an erupted meter, the question of exclusive negligence of the defendant was submitted to the jury under proper instructions from the court. In permitting witness Flanders to answer the hypothetical questions, we perceive no error.

The Gas Company argues that no witness testified directly and positively to any facts regarding its negligence which could be construed as the exclusive and proximate cause of the explosion or from which such exclusive negligence could be inferred. The defendant appears to take the position that employees of the Grinnell Company were installing or testing steam equipment in the boiler house and the first explosion was caused by the bursting of steam equipment which, in turn, damaged the gas installations and thus caused the second explosion and fire. But, to support such a theory, it assumes inferences to be drawn from facts which are not supported by the evidence. For example, there was no evidence that an employee of the Grinnell Company was engaged in installing or testing steam equipment in the boiler house at the time of the explosion. Defendant argues that the relief valve at the Brick Plant was relieving in a normal manner. The only evidence on this point is that this valve was intermittently relieving the pressure during the morning and that shortly before the explosion

the defendant's employee found that the valve was relieving at a pressure much higher than normal. This evidence does not support a conclusion that the pressures in the line on that day were normal and customary. The defendant contends that the exploding gas meters were of standard design and that they had been tested to carry a given pressure, but we find no evidence to that effect. It is true that it was stated by one or more of the plaintiff's witnesses that at the time of the original installation several years prior to 1957, the meters and equipment gave the appearance of being new.

There was ample evidence to support the inference that the regulators at the primary station, which were designed to reduce the pressure in the lines, were not functioning properly. When Eason found the only relief valve in the whole system operating at an unusually high pressure, he made no effort to shut off the supply of gas at the primary station, which he could easily have done. Special tools were not required for shutting off the gas at the cutoff valves since, after the explosion, Jones operated these valves with channel lock pliers. It was clear from the evidence that the gas pressure in the line was unusually high and that the regulators were not performing properly, but there is no evidence that Cranston received any warning of the condition discovered by the Gas Company employee. There was evidence of the fact that one meter erupted violently without any indication of interference from an outside source. Following the explosion, the gas was heard to be screaming through the regulators at the primary station 300 feet away from the boiler house. The violence of the explosion was clearly demonstrated.

The Gas Company urges that the trial court erred in admitting into evidence a rounded piece of metal said to resemble the piece of metal which was delivered by the witness Bishop to Gaffney and which, following later search, could not be found or produced. It is true that such a piece of metal was produced in court and was

assigned an exhibit number but we cannot find from the record that it was admitted. Moreover, because of the inability of the witness to positively identify the source of this exhibit, it was not even offered in evidence. The defendant claims prejudice resulting from the failure of Cranston to produce the piece of metal found by Bishop but a reasonable explanation of such failure was made. We know of no rule which would exclude evidence concerning physical objects which are not exhibited, and particularly where a reasonable explanation of the inability to produce them is offered.

The defendant contends that certain items included in Cranston's alleged damages were not related to the explosion loss. But the actual bills for repairs and replacements which had been paid were, at the instance of the Gas Company, produced and admitted in evidence. These were offered to corroborate the testimony of witnesses concerning damages resulting from the explosion. Cross-examination revealed the inclusion of travel expenses of a company officer from the Rhode Island main office to the North Carolina plant. But testimony was introduced to show that his travel was necessary and directly connected with the repair of the explosion damage. Thus, a question for jury determination was presented.

The defendant complains that the court permitted the jury to consider, as elements of damage, lost operating profits during the shutdown following the explosion and interest thereon, but it is clear from the court's charge that the jury was permitted to consider interest only on property damage and not on lost profits. In its complaint Cranston alleged lost operating profits in excess of $10,000 as an element of damage, and the record discloses that Cranston suggested to the court the submission to the jury of a separate issue as follows: "What amount of damages, if any, is plaintiff entitled to recover of the defendant for loss of use of its plant?" But the court chose to disregard this suggestion and submitted only one issue as to damages. No objection was offered by the defendant to this action of the court nor was any objection made to the court's explanation to the jury as to possible elements of damage, including lost profits. It is further contended that there was insufficient evidence to support a jury finding of lost profits. There was unchallenged evidence that, at the time of the explosion, Cranston had firm orders to the full extent of its production capacity, and that the plant was operating full time on a three-shift basis with approximately 700 employees.

Cranston produced a witness, Holt, to testify concerning operating losses following the explosion. He stated: "The basis was taken in the actual experience immediately prior to the explosion, the immediate two weeks prior to the explosion, on the daily average production and compared with the actual production from the time of the explosion until the time we got back into full production again. The loss in yardage——." Here he was interrupted by defense counsel and was not permitted to complete his statement. Shortly thereafter he was again asked by Cranston's counsel for a further explanation and he was again subjected to an interruption, in effect an objection, by defense counsel, whereupon the court stated: "He said he had arrived at the figures that he was about to give based on the formula that he set out. You have been over that." And the court then propounded this question: "What in your opinion was the amount of the loss or what do your books reflect the loss to have been?" The witness then stated a loss of gross profit of $9,572.57, the payment of necessary "stand-by labor," Social Security taxes, Workmen's Compensation insurance, a total of $10,480.58.

As hereinbefore stated, the jury returned a verdict for more than $26,000. Proof was offered that property damage, including repairs and replacements, amounted to $21,406.31. It is obvious

that the jury verdict included an allowance for damages resulting from the shutdown of operations and, possibly, interest on the amount found as damages to property. The defendant argues that there was no showing of usual profits from operations and that Cranston's claim for damages in that particular was based upon nothing more than speculation and conjecture.

██ In a tort action, when damages in the nature of lost profits are pleaded, it is not error to admit proof thereof. Steffan v. Meiselman, 1943, 223 N.C. 154, 25 S.E.2d 626. Lost profits constitute a proper element of damage where such loss is the direct and necessary result of defendant's wrongful conduct, and such profits are capable of being shown with a reasonable degree of certainty. Reliable Trucking Co. v. Payne, 1951, 233 N.C. 637, 65 S.E.2d 132.

██ Twice the witness, Holt, undertook to explain in detail the calculation of such losses and twice he was prevented from doing so by counsel for the party now complaining. A party cannot successfully complain of error for which he, himself, is responsible or of rulings which he has invited the trial court to make. A party who procures or is responsible for the exclusion of adverse evidence is estopped to assign as error the fact that the record is devoid of such evidence.[2]

Considering the evidence as a whole and in the light most favorable to Cranston, we think the case was fairly submitted to the jury, the court accepting the Gas Company's own contention that it was contractually responsible only for damages resulting from its exclusive negligence. It is our opinion that the evidence was sufficient to sustain the verdict.

Affirmed.

2. See Hudson v. Wylie, 9 Cir., 1957, 242 F.2d 435, certiorari denied 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41; F. W. Woolworth Co. v. Contemporary Arts, Inc., ██ 344 U.S. 228, 231, 73 S.Ct. 222, 97 L. Ed. 276; Mach v. Abbott Co., 8 Cir., 1943, 136 F.2d 7, 10.