**NATIONAL STEEL CORPORATION, Plaintiff-Appellant,**

**v.**

**The GREAT LAKES TOWING COMPANY, Defendant-Appellee.**

**No. 76–2033.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 13, 1977.

Decided April 10, 1978.

Robert A. Jenkins, Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., for plaintiff-appellant.

William J. Miller, Arter & Hadden, Robert G. McCreary, Jr., Cleveland, Ohio, Fred H. Keidan, Watson, Wunsch, & Keidan, Detroit, Mich., for defendant-appellee.

Before PHILLIPS, Chief Judge, and PECK and MERRITT, Circuit Judges.

JOHN W. PECK, Circuit Judge.

Plaintiff National Steel Corporation owns and operates four blast furnaces, on Zug Island, in the Rouge River near Detroit. The steelmaking capacity of the plant is determined by the output of the Zug Island furnaces, which normally operate at full capacity around the clock, seven days a week. The rest of the steelmaking facility is located on the mainland across the Short Cut Canal, and a railroad bridge owned by the plaintiff is the only means of transporting hot iron ore from the island to the mainland to be processed into steel slabs.

On October 11, 1972, defendant Great Lakes Towing Company was towing a Greek vessel, the Navishipper, up the river when one of the towlines snapped. The boat swung against the plaintiff's railroad bridge, causing structural damage. Repairs were promptly carried out, and the bridge was back in full use three days later.

Immediately after the collision National Steel stopped the transportation of hot ore across the bridge. After examination of the bridge, it was determined that light loads could be safely moved across, by alternating loaded cars with empty cars. Only three of the four furnaces were operating; the fourth was shut down for maintenance and repairs. By reducing the production of the three remaining blast furnaces as much

as possible, the plaintiff was able to avoid shutting down the furnaces completely, and thus avoided significant shut-down and start-up costs. By the time repairs were completed on the bridge, approximately fifty hours of production were lost, amounting to slightly over 6000 tons of slabs of steel production.

The plaintiff brought an admiralty and maritime claim against the Navishipper, the tugboats, the Great Lakes Towing Company, and the manufacturers of the towline. At trial, all defendants other than the Great Lakes Towing Company were dismissed, liability was admitted by the defendant, and the trial was limited to the issue of damages. The plaintiff sought repair costs, expenses connected with the three days of impaired production, and damages for the lost fifty hours of production time.

Plaintiff routinely produces most of its steel needs, but to maintain an adequate inventory, from time to time it has to purchase supplemental supplies at an increased cost. Since it lost about 6000 tons of steel production during the three day interruption, and the plant normally operates at full capacity 365 days a year, plaintiff argues that it had to purchase 6000 tons more than it would have had to if there had been no interruption. Therefore, it contends that a reasonable measure of damages for lost production would be the difference between the cost to it of producing 6000 tons of steel, and the cost of purchasing 6000 tons in October, 1972.

The defendant argues, relying on plaintiff's production records, that the 6000 tons of lost production were made up during the latter part of the month of October. There is no dispute that the average daily production after the accident was slightly greater than before the accident, and that the plaintiff actually exceeded its production goal in October. The plaintiff responds, however, that it operates continuously at full capacity, and that while daily production fluctuates somewhat, due to variations in the quality of raw materials and work crew efficiency, it has no power to "make

342

up" lost production time. Thus, even if production goals were exceeded, 6000 tons more would have been produced without the interruption.

Faced with this evidence, the district court found itself unable to decide whether the lost production time was made up due to a management decision, and thus decided the issue on the basis of which party had the burden of proof. While finding that $69,741 (the difference between the cost to National Steel to produce the steel and the cost to purchase it) was a reasonable measure of the value of the lost production, the district court held that the question of whether lost production was made up was not a matter of mitigation of damages, but was rather "a necessary part of the plaintiff's presentation of proofs to support its claim for special damages." Having thus concluded that the burden was on the plaintiff, the district court denied recovery for that element of damages, since the plaintiff had failed to convince the court by a preponderance of the evidence that it had *not* made up the lost production. Judgment was entered in favor of the plaintiff for repair costs and expenses directly related to the interruption of production only.

National Steel has appealed the denial of damages for lost production time. It argues that the trial court's finding that the evidence was "about equal" on the question of whether lost production was made up was clearly erroneous, because the defendant presented no evidence to refute National Steel's explanation for the fluctuating production levels. Further, it argues that even if the evidence was "equal," the question is one of mitigation of damages, and the burden of proof should have been on the defendant.

Great Lakes Towing Company's position is that the trial court was right in concluding that proof that the lost production time was not made up was part of plaintiff's basic burden of proof as to loss. It also argues that the plaintiff failed to prove any connection between the alleged loss suffered and outside purchases of steel in October. Finally, the Towing Company contends that lost production time is an injury too remote for recovery.

Disposing of defendant's final contention first, recovery for the value of production time lost as a result of negligence is permissible so long as the damages are proved to a "reasonable degree of certainty." *Cranston Print Works Co. v. Public Service Co. of N.C.*, 291 F.2d 638, 649 (4th Cir. 1961). Any harm proximately caused by negligent actions of a defendant is compensable, and although damages may not be determined by speculation or guesswork, evidence allowing a just and reasonable estimate of the damage based on relevant data is sufficient. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The bridge had been used for many years as the sole means of transporting hot ore to the mainland. The Towing Company regularly moved boats through the Short Cut Canal, and its dock was located upstream of the bridge. The collision was the sole, direct cause of the interruption of production, and it was plainly foreseeable that damaging the bridge would have the result of denying the Steel Company the use of its production facilities. On rare occasions courts deny recovery of even foreseeable, proximately-caused damages on the grounds that the injury is too remote, and the defendant contends that this is such a case, relying on the well-known opinions in *Petition of Kinsman Transit Co.*, 338 F.2d 708 (2d Cir. 1964) and 388 F.2d 821 (2d Cir. 1968). In those cases, a vessel was negligently tied and anchored in the Buffalo River. In January, an ice jam broke loose upriver and lodged against the boat, breaking her mooring lines. She collided with another moored boat, breaking it loose as well. Both vessels drifted downriver, causing damage to other boats on the way, and finally crashed into a bridge which the City of Buffalo had negligently failed to raise in time. The bridge collapsed, and the wreckage along with the two boats created a dam which caused extensive flooding and an ice jam reaching three miles upstream. Transportation on the river was interrupted for almost two

months. Judge Irving R. Kaufman held that while both the damage caused to the other boats on the river and flood damage along the river were recoverable, damages caused because winter wheat could not be moved upriver or unloaded due to the defendant's negligence were "too tenuous and remote to permit recovery." 388 F.2d at 825.

The facts of that case are far removed from the events on the Rouge River. Un-like the mishap piled upon mishap in the *Kinsman* case, "an extraordinary concatenation of even more extraordinary events, not unlike the humorous and almost-beyond-all-imagination sequences depicted by the famous cartoonist Rube Goldberg," 338 F.2d 708, 727, in this case the sequence of events was direct, immediate and predictable. The boat struck the railroad bridge due to defendant's negligence, causing structural damage. Since transportation across the bridge was a necessary link in National Steel's production process, plaintiff lost production time during the three days required to repair the bridge. While we agree that at some point the link between cause and effect may be "too tenuous—that what is claimed to be consequence is only fortuity," 338 F.2d at 725, that point was not reached in this case.

Nonetheless, Great Lakes Towing argues that National Steel is not entitled to damages for lost production because any production that was lost was then made up in the weeks following the accident, so there was no "permanent" loss of production. The plaintiff's factual response that it operates continuously at full production, with no control over fluctuations in output, and thus could not possibly have "made up" lost production is persuasive, but we need not decide whether the district court's decision as to that issue is clearly erroneous. The entire question is irrelevant; it makes no difference to the plaintiff's right to recover damages for lost production whether it made up the lost 6000 tons of production; and if it did so, whether it occurred by chance or management decision. It is also irrelevant whether outside purchases made in October were a direct result of the acci-

dent or not. The defendant has created a legal chimera, picking up snatches of theory and tort liability phrases, patching them together into an argument which left both parties and the district court confused about the issue.

A few basic principles of tort liability must be kept in mind in order to understand the flaws in defendant's argument. First of all, a plaintiff is entitled to recover all damages proximately caused by the defendant which can be proved with a reasonable degree of certainty. When a defendant's negligence results in an interference with the use of plaintiff's property, the plaintiff is entitled to recover the value of the use during the interference, or the value of the amount paid for a substitute. Restatement of Torts, §§ 928, 931(a). The tort is complete and liability attaches when the harm is suffered. The plaintiff has a duty to take reasonable steps to mitigate damages, but this is a concept of *avoidance*, not repair. Thus the plaintiff must take all reasonable steps to prevent the accumulation of damages, and to minimize the effect of defendant's negligence; but the duty to mitigate applies only to damages which one can prevent, not to damages already accrued. Finally, the principle which governs this lawsuit, a defendant cannot take advantage of events occurring *after* harm has occurred and liability has attached to reduce the damages for that harm. Thus if a person is injured and is unable to work for a month, he is still entitled to recover for lost earnings, even though his employer gratuitously pays him for that month. Equally, and more directly applicable to the facts of this case, if the injured person works particularly hard after recovery, and at the end of the year has earned his normal salary, the defendant cannot argue that there has been no loss. *See, e. g., Frankel v. Todd*, 393 F.2d 435 (3d Cir.), *cert. denied*, 393 U.S. 855, 89 S.Ct. 137, 21 L.Ed.2d 120 (1968) (applying Pennsylvania law).

Mr. Justice Holmes described this principle in the case of *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918):

The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant, so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict when they paid [the unlawful charge]. Their claim accrued at once in the theory of the law, and it does not inquire into later events.

245 U.S. at 533–534, 38 S.Ct. at 186. *Accord, Chattanooga Foundry v. Atlanta,* 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) (Holmes, J.). More recently, the same rule governed the antitrust case, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 490, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In that case, the plaintiff's complaint charged that defendant, as a result of its unlawful control of the market, had forced the plaintiff to pay excessive rentals for the lease of shoe machinery. The defendant responded that even assuming the plaintiff's charges were true, there were no damages because the plaintiff passed on any excessive charges to its customers. In 1960, the district court, Circuit Judge Herbert F. Goodrich, sitting by designation, decided this issue in plaintiff's favor:

The plaintiff's injury occurred when it was charged too much for the machinery. . . . The plaintiff against whom a tort is committed has his cause of action at the moment that the tort occurs. Of course, he is subject to the rule of avoidable consequences and cannot sit still and let damages pile up when reasonable steps would have prevented further consequential damages. But that is the extent of his obligation. Things which happen later and let an injured plaintiff escape some of the ultimate consequences of the wrong done him do not inure to the benefit of the defendant. Thus, if a man is injured by the negligence of another and has the good fortune to have an insurance policy which recompenses him for loss, the insurance money does not reduce the damages which the wrongdoer must pay. If friends of a man against whom a tort is committed make up a purse to pay for his medical services, that does not cut down what the plaintiff may recover from the tortfeasor. Wages continued by an employer during a time when an injured man is not working do not redound to the benefit of the wrongdoer. And, likewise, if a man having sustained an injury works extra hard after his recovery and comes out at the end of the year as financially well off as he would have been without the loss of time, the wrongdoer cannot claim reduction of damages on this account.

185 F.Supp. 826, 829–830 (M.D.Pa.1960) (footnotes omitted). The Supreme Court ultimately affirmed, holding:

Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense.

392 U.S. at 494, 88 S.Ct. at 2232.

■ Applying these principles to this case, the flaw in defendant's argument quickly becomes clear. The Towing Company's negligence directly and immediately resulted in the loss of fifty hours of production. At the end of three days of production interruption, National Steel had a cause of action against the Towing Company for all losses suffered. Whatever occurred later, whether due to fortuitous events or plaintiff's diligence, cannot affect that liability.

This is not to say that the question of whether or not lost production was made up would never be relevant to a case of this sort; but when the only damages sought are for loss of use resulting in lost production, that question cannot affect the result. If, hypothetically, National Steel were to seek damages incurred because it could not meet its contract obligations for the month of October, the factual issue of whether production was made up would be crucial. Proof of failure to attempt to make up production losses, in order to avoid the contract losses, would be a matter of mitiga-

tion, and the burden of proof would be on the defendant. Further, if National Steel contended that in order to meet its contract obligations, it purchased outside steel at a higher price, and desired to recover its increased expenses, proof that it had made up its lost production would be relevant to the issue of causation. But here, National Steel merely seeks to recover the reasonable value of the loss of use of its property, a loss which was fixed when the bridge was returned to use.

■ The proposed measure of damages—the difference between the cost of purchasing outside steel and the cost of producing its own steel—is a reasonable one, as the district court found. There is no dispute that during the fifty hours that National Steel could have been producing its product but for defendant's negligence, it would have produced 6000 tons of steel slabs. The value of the use of its facilities during that period of time is the value to it of the lost production. At the same time, plaintiff was purchasing outside steel at a slightly higher cost (lower than market price—the purchases were from a sister division at cost plus transportation expenses), and thus, with reasonable accuracy, the plaintiff could calculate the value to it of its lost production by subtracting saved costs from the cost of a substitute.

There are other permissible measures of damage for loss of use, including lost profits, *Steel Motor Service v. Zalke*, 212 F.2d 856 (6th Cir. 1954), *Cook Industries, Inc. v. Carlson*, 334 F.Supp. 809 (D.Miss.1971); lost income, *Petition of M/V Elaine Jones*, 480 F.2d 11 (5th Cir. 1973); reasonable rental value; or the cost of a substitute until repairs are made, *cf. Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932). Some of these measures would not have been appropriate given the facts of this case, and would probably have resulted in a higher measure of damages than plaintiff's proposal. In any case, defendant did not propose or attempt to prove an alternative measure of damages, and we cannot conclude that the district court was in error in accepting this measure as reasonable.

In *Continental Oil Co. v. SS Electra*, 431 F.2d 391 (5th Cir. 1970), *cert. denied*, 401 U.S. 937, 91 S.Ct. 925, 28 L.Ed.2d 216 (1971), a measure of damages very similar to the one sought here was allowed. In that case, the Electra collided with an offshore drilling platform, wrecking the platform and halting production. The parties agreed that the net value of the lost production was $60,000. The defendant argued that the plaintiff had not shown that there was any permanent loss of production, because the oil was still available to be tapped in the future. The court of appeals pointed out:

All of this wholly misses the mark. The oil companies do not claim for lost oil or damage to oil as an asset. Their suit is for damages suffered as a consequence of the collision of the ship with the platform. Profit on oil production is simply one means of measuring the damage suffered.

431 F.2d at 392. As the court noted, damages for lost production are squarely within the basic damage doctrine for marine collision of *restitutio in integrum.* Thus, for a vessel negligently damaged in a collision,

. . . the owners of the injured vessel are entitled to recover for loss of her use, while laid up for repairs. When there is a market price for such use, that price is the test of the sum to be recovered. When there is no market price, evidence of the profits that she would have earned if not disabled is competent; but from the gross freight must be deducted so much as would in ordinary cases be disbursed on account of her expenses in earning it.

*The Potomac*, 105 U.S. 630, 631, 26 L.Ed. 1194 (1882). See also, *Compania Pelineon de Navegacion v. Texas Pet. Co.*, 540 F.2d 53 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (damages for reasonable current market value of use of damaged ship allowed); *Crown Zellerbach Corp. v. Willamette-Western Corp.*, 519 F.2d 1327 (9th Cir. 1975) (damages suffered when barge negligently severed power line to factory measured by value of lost production less saved expenses).

It follows that the fact that plaintiff did not prove a direct link between the 6000 ton loss of production and purchases of outside steel in October is also of no consequence. The cost of outside purchases is merely being used as reasonable, contemporaneous evidence of the value of plaintiff's steel production. Actually, using these costs as guidelines probably underestimates the actual value, because plaintiff obtained the steel in October at cost plus transportation expense, not at market value. Again, if National Steel were attempting to recover increased expenses due to outside purchases necessitated by defendant's negligence (the concept of cover costs under the UCC) then the Towing Company's argument might be persuasive; however, since the recovery is for lost production, it is of no importance that the October purchases were not a direct result of the accident.

In addition to the theoretical underpinnings of this analysis, there are sound policy reasons why defendant's position cannot prevail. Defendant argues that in order to recover for damages sustained during the three-day interruption, National Steel must prove that the production loss was "permanent," and that it did not make up the lost production. It also argues that such proof does not go to the question of whether damages were mitigated, but is part of the plaintiff's case in chief. At the same time, while plaintiff has a duty to avoid as much loss as possible, it has no duty to attempt to recoup losses suffered. Thus in the face of a loss created by defendant, a plaintiff would have neither a duty to attempt to make up the loss, nor any incentive to do so, since any gain achieved by plaintiff's diligent efforts would simply be taken away from him in the form of a reduced judgment.

It should also be emphasized that this result does not create any significant possibility of rewarding a party who has not been damaged. Though far from refined economic theory, it is roughly true that a person (or company) has finite resources which can be devoted to any business or endeavor. If time, energy and money did not have to be devoted to recapturing a loss which has been suffered, a plaintiff would have, in Judge Goodrich's words,

> more money to pay out in dividends, or to engage in a further development campaign . . . or to raise the wages of its employees, or to enlarge its bank account as protection against a rainy day, or for all of these things.

*Hanover Shoe, supra,* 185 F.Supp. at 829. To be sure, it is not unheard of for a person to be better off after an accident; perhaps the crisis has forced the plaintiff to experiment with more efficient techniques of production or better raw materials, but to inquire into such possibilities with an eye to reducing a defendant's liability would plunge the courts into a murky realm of economic speculation which they are ill-equipped to explore.

Therefore, the decision of the district court is reversed insofar as it holds that damages for lost production are not recoverable by National Steel. The cause is remanded to the district court for modification of its judgment in favor of the plaintiff to include the sum of $69,741, the reasonable value of the production lost due to defendant's negligence.