# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3940

_____

ConAgra, Inc., doing business         *
as Peavey Barge Lines,                *
                                      *
          Plaintiff - Appellee,       *
                                      *   Appeal from the United States
     vs.                              *   District Court for the
                                      *   Eastern District of Missouri
Inland River Towing Company,          *
                                      *
          Defendant - Appellant.      *

_____

Submitted:  September 15, 2000

Filed:  June 8, 2001

_____

Before BOWMAN, BEAM, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

In this admiralty case, we are asked to review the district court's[1] finding that a barge owner lost profits while repairing several barges damaged in towing accidents. We are also asked to review the district court's award of prejudgment interest on those lost profits.  Finding no clear error in the district court's fact finding, and no abuse of discretion in the award of prejudgment interest, we affirm.

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

## BACKGROUND

In 1994, Inland River Towing Company (Inland) contracted with ConAgra, Inc., doing business as Peavey Barge Lines (Peavey), to tow the large fleet of barges[2] Peavey operates on the inland rivers of the United States. On six occasions between April 1994 and June 1996, twenty-seven barges towed by Inland were damaged in accidents. Peavey had the barges repaired at various times between February 1995 and July 1996. In November 1996, Peavey sued Inland to recover for (1) cargo damage caused by the accidents, (2) the repair costs of all twenty-seven barges, and (3) loss-of-use damages for twenty-five of the barges. Only the last claim is at issue in this appeal.

The district court conducted a four-day bench trial. To prove that it suffered loss-of-use damages, Peavey called two witnesses — Timothy Power, Peavey's vice-president of operations; and Jay Johnston, vice-president of freight grain merchandising. Power and Johnston testified that the barge market was very active between February 1995 and July 1996, that demand for barges exceeded supply, that Peavey's entire fleet of available barges was always in use to the extent possible, and that Peavey had no spare barges that they could substitute without losing revenue.

Power oversaw barge maintenance, repair, and dispatching, and had personal knowledge of the day-to-day operation of Peavey's entire fleet. He testified that demand for barges between February 1995 and July 1996 was "very high" and the "highest level of demand that [he] had seen" during his 15 years in the river industry. Tr. at 215, 216. He testified that Peavey worked as fast as its system allowed to keep all available barges ready for use, because the "market was contributing at a level far exceeding fixed costs, so the faster we could move the barges after they completed and repaired and were ready for their next loading, it just created more of an opportunity

---

[2]Peavey operated between 1200 and 1500 barges from 1994 to 1996.

to add to our bottom line." Id. at 216. Power admitted there were times, in his eight years with Peavey, that Peavey idled some barges because of low demand. But he stated that February 1995 to July 1996 was not one of those periods. During those eighteen months, Peavey had no spare barges to take the place of damaged barges, and it used its available barges to the full extent possible.

Johnston sold barge use to customers and also had personal knowledge of the day-to-day demand for Peavey's barges. In addition, Johnston had knowledge of the general market demand for barges, since he checked on Peavey's competitors on a constant basis. Johnston testified about a relationship between the going freight rates on the river, and demand for barges. He explained that whenever the freight rates were high, the demand for barges was high. Based on his personal knowledge of Peavey's daily barge demand, and his review of records showing the average freight rates, Johnston testified that demand for barges between February 1995 and July 1996 was "extremely high" and the "highest period" he had seen in many years. Id. at 378-79. He testified that as soon as Peavey unloaded a barge, it easily resold the barge's use to another customer. Johnston indicated that demand for barges exceeded the available supply, that Peavey had no idle barges, and it could have sold the use of more barges if they had been available.

On cross-examination, both Power and Johnston admitted that they didn't know the total number of barges Peavey operated between February 1995 and July 1996, or the total number of freight commitments Peavey had during that period. They also admitted the possibility that "bought in" freight had been substituted for the damaged barges. "Bought in" freight referred to barge use Peavey purchased as a commodity in a futures market. In addition to operating its own fleet of barges, Peavey often speculated by "buying in" other freight for use in the future. Peavey then hoped to profit by using "bought in" freight to to fulfill commitments at a future date, at less expense than the cost of using its own barges.

Peavey also presented evidence to prove the amount of the loss. Peavey introduced regularly-kept records that showed the company's average fleetwide earnings, or barge earnings per day. Peavey calculated its per-day barge earnings on a monthly basis by (1) adding the gross revenue generated by Peavey's entire fleet of barges during the month, (2) subtracting expenses, and (3) dividing that figure by the total number of available barge days in that month. For each discrete period of time that a damaged barge was under repair, Peavey requested the district court to award loss-of-use damages by multiplying the fleetwide net barge earnings by the number of days the particular barge was out of service.

Prior to trial, Peavey had used two other methods to compute the amount of its loss-of-use damages. The first method based the loss on the cost of insuring and maintaining the barges. The second method utilized Peavey's "net freight position reports"[3] to choose a particular freight commitment that a barge might have met had it not been under repair, and then estimated the net revenue the barge would have earned from that trip. The evidence showed that the net revenue of individual barge trips varied dramatically. Individual trips could net less than a dollar a day, or more than $100. At trial, Peavey settled on the net barge earnings method, arguing that it was the fairest method, gave the best picture of what a barge was likely to earn, and involved less guesswork than other methods.

Following the bench trial, the district court awarded Peavey loss-of-use damages. Adopting a rule followed by the Fifth Circuit in a case involving a single vessel (rather

---

[3]Peavey tracked its available barges on a daily basis with temporary "net freight position reports" that showed the total number of barges Peavey had available, as well as the total number of commitments Peavey had to fill. Prior to trial, Peavey had disclosed an expert that relied upon the "net freight position reports" to calculate the amount of lost profits. Peavey did not regularly retain its "net freight position reports," however, and since it could not introduce those reports at trial, chose not to call the expert.

than a fleet), the district court held that lost profits could reasonably be assumed to have been lost upon a showing that an active and ready market existed for the type of vessel damaged. See In re M/V Nicole Trahan, 10 F.3d 1190, 1194-95 (5th Cir. 1994). Applying that legal standard, the district court concluded that "Peavey carried its burden of showing that demand was high, and that there was a ready market for the type of barges damaged by [Inland's] negligence." The district court also found that "Peavey was operating its entire fleet of barges and had no 'spare' barges that could be substituted for the damaged barges without losing revenue on the substitutes."

As to the amount of the loss, the district court determined that Peavey's fleetwide average method of calculating loss-of-use damages was reasonable, and awarded damages accordingly. The district court also awarded prejudgment interest on the loss-of-use damages, which it calculated by using the same dates that the parties had stipulated could be used to calculate prejudgment interest on repair costs.

On appeal, Inland argues that the "active and ready market" test for proving lost profits is inappropriate in a case involving a fleet of vessels, where a plaintiff can use spare vessels to substitute for those under repair. Inland also challenges the district court's finding that Peavey had no spare barges. Inland argues that the testimonial evidence of Power and Johnston, standing alone, is insufficient to take the loss-of-use claim "outside the realm of conjecture, speculation, or opinion unfounded on definite facts." Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239, 241 (8th Cir. 1981).

With respect to the amount of loss, Inland contends that the average fleetwide net earnings method is legally inadequate to prove loss-of-use damages to a reasonable degree of certainty. Inland argues that Peavey must prove the specific profitability of particular barges for particular voyages. Inland also contends that Peavey's proof of the amount of loss is inherently suspect because Peavey changed its methodology for calculating the amount of loss (and the amount itself) several times before and during trial.

Finally, Inland asks us to reverse the award for prejudgment interest on the loss-of-use damages. Inland contends that the district court abused its discretion in awarding prejudgment interest because Peavey failed to show when it would have been paid for trips that each damaged barge would have made during the times of repair. Without such evidence, Inland argues the district court abused its discretion by calculating prejudgment interest from the dates the parties agreed to use for prejudgment interest on repair costs.

## DISCUSSION

We review a district court's fact findings in an admiralty case for clear error. Mid-American Transp. Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1073 (8th Cir. 1073). Under the clear error standard of review,

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985).

Proving loss-of-use damages in an admiralty case involves two elements. First, a vessel owner must prove that profits "have actually been, or may be reasonably supposed to have been, lost." The Conqueror, 166 U.S. 110, 125 (1897). Second, the amount of lost profits must be "proven with reasonable certainty." Id. We have generally stated that to prevail on a claim for loss-of-use in an admiralty case

> the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts.

> As an element of recoverable damages, the sufficiency of the evidence of lost profits is dependent upon whether the financial information contained in the record is such that a just or reasonable estimate can be drawn.

Cargill, 642 F.2d at 241 (internal citations omitted). But when a party satisfies the first element with satisfactory proof of lost profits, "[t]he fact that the exact amount is difficult to determine should not deprive [a party] of its right to recovery." Mid-American, 480 F.2d at 1074.

Inland contends that we should review the district court's decision de novo, rather than for clear error, because the district court applied an incorrect legal standard to the loss-of-use claim. Inland argues that the Fifth Circuit's "active and ready market" test, relied upon by the district court, is inappropriate in a case involving a fleet of vessels. See In re M/V Nicole Trahan, 10 F.3d at 1194-95 (holding that lost profits could reasonably be assumed when the owner of a single tanker showed that an active and ready market existed for his vessel, despite the lack of direct evidence of a specific, lost opportunity). Essentially, Inland argues that a multiple vessel owner who merely shows that an active and ready market exists for its fleet has failed to bring its loss-of-use claim "outside the realm of conjecture, speculation or opinion unfounded on definite facts." Cargill, 642 F.2d at 24. Inland contends that a multiple vessel owner must present specific proof that it had no spare vessels to use in that "active and ready market" while its damaged vessels were under repair.

We find it unnecessary to address the district court's reliance upon the "active and ready market" test.[4] In addition to finding that "Peavey carried its burden of showing that . . . there was a ready market for [its] barges," the district court also found that "Peavey was operating its entire fleet of barges and had no 'spare' barges that could

---

[4]We note in passing, however, that the Fifth Circuit has also applied the test in a case involving a fleet of barges. See Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 379 (5th Cir. 2000).

be substituted for the damaged barges without losing revenue on the substitutes." Thus, even if a multiple vessel owner may not recover loss-of-use damages upon a mere showing of an active and ready market, the district court made the additional factual finding that Inland would require. Therefore, we need only review that fact finding for clear error, based on the quantum and quality of evidence presented by Peavey.

The district court's finding that Peavey had no spare barges rests exclusively upon the testimonial evidence of Power and Johnston. Inland claims that their testimony lacks the specificity required for a loss-of-use claim, because Peavey offered no documentary evidence in support of its claim. Inland focuses upon the fact that both witnesses merely testified in general terms that demand for barges was "high" or "very high" between February 1995 and July 1996. Inland compares that testimony to similar evidence found wanting in other loss-of-use cases. See Dow Chemical Co. v. M/V Roberta Tabor, 815 F.2d 1037, 1042-43 (5th Cir. 1987) (affirming a district court's denial of loss-of-use damages where barge owner testified that it was "safe to say" all of its other barges were earning money while its damaged barges were out of service); Inland Oil & Transp. Co. v. Ark-White Towing Co., 696 F.2d 321, 326 (5th Cir. 1983) (partially reversing a district court's award of loss-of-use damages where a barge owner "could not say whether the two barges would have been under contract had they not been in the shop").

Unlike the barge owners in Dow Chemical and Inland Oil, who couldn't "say" for sure, both Johnston and Power stated unequivocally that Peavey made full use of its available barges to the extent possible, and had no spare barges. Both witnesses based their testimony on personal knowledge of Peavey's day-to-day barge operations during the eighteen months in issue, and their general experience with barge demand before and after that period. Thus, although the lack of direct documentary evidence to support those statements concerns us, we cannot conclude that the district court clearly erred. Cf. Mid-American, 480 F.2d at 1074 (reversing a district court's denial of lost profits where barge fleet owner showed activity and profitability of barge

towings during and subsequent to period of repairs, and showed that its objective was to complete as many barge trips as possible between St. Paul, Minnesota, and New Orleans, Louisiana, during an eight and one-half month interval).

Despite Johnston's and Power's unequivocal assertions on direct examination that Peavey was using 100% of its barges, Inland argues we must still reverse because of the concessions both witnesses made during cross-examination. We disagree. Although both admitted that they didn't know exactly how many barges Peavey operated during the eighteen months in issue, or the total number of freight commitments, their personal knowledge that barges were moving as fast as Peavey's system allowed didn't depend on knowing the exact numbers.

Both witnesses acknowledged that Peavey may have used "bought in" freight at times to cover commitments that the damaged barges might have handled. That fact doesn't discredit the testimony that Peavey could have sold the use of *even more* barges if they had been available. On the contrary, we think the fact that Peavey frequently speculated with "bought in" freight demonstrates the strength of the barge market during the relevant time period, and supports Peavey's claim of fully utilizing its own fleet. If Peavey didn't regularly expect full use of its own fleet, we doubt it would have been as likely to purchase the use of other barges. As a result, we cannot conclude that the district court clearly erred in finding that Peavey presented satisfactory proof of lost profits.

Inland also contends that Peavey failed to prove the amount of its loss to a reasonable degree of certainty. Inland challenges the methodology chosen by Peavey to prove the loss-of-use claim, i.e., the average fleetwide net barge earnings per day, not the amounts shown by that methodology. "No more is required" of a district court than to adopt a methodology that permits it to arrive at a damage amount "with 'reasonable certainty.'" Marine Transp. Lines v. M/V Tako Invader, 37 F.3d 1138, 1440 (5th Cir. 1994); cf. Mid-American, 480 F.2d at 1074 (remanding a case for calculation

of loss-of-use damages even though the exact amount may be difficult to determine). Showing average past earnings has been recognized as a valid method in some circumstances, see Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 379 (5th Cir. 2000); Turecamo Mar., Inc. v. Weeks Dredge No. 516, 872 F. Supp. 1215, 1233 (S.D.N.Y. 1994), and we see no reason to reject a daily average fleetwide earnings method when that method appears to be the regular means by which a barge owner tracks its profits.

Finally, Inland contends that the district court should not have awarded prejudgment interest to Peavey on the loss-of-use damages, because Peavey failed to present specific evidence to show when it would have been paid for the lost trips that the damaged barges would have made. Inland also claims that the district court should not have calculated prejudgment interest from the dates the parties agreed could be used for prejudgment interest on the repair costs.

"Prejudgment interest is awarded in admiralty suits in the discretion of the district court to ensure compensation of the injured party in full and should be granted unless there are exceptional or peculiar circumstances." Ohio River Co. v. Peavey Co., 731 F.2d 547, 549 (8th Cir. 1984). This general rule includes claims for lost profits. See Gen. Facilities, Inc. v. Nat'l Marine Serv., Inc., 664 F.2d 672, 675 (8th Cir. 1981). We find no abuse of discretion in the district court's decision to award prejudgment interest for Peavey's loss-of-use damages, nor in the decision to calculate the interest from the dates agreed to by the parties for awarding prejudgment interest on repair costs.

We affirm the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.