NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0382n.06

No. 19-6088

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 26, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| RIVERFRONT DEVELOPMENT, INC., and CITY OF MEMPHIS, TENNESSEE, | ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| WEPFER MARINE, INC., | ) ) | |
| Defendant-Appellant. | ) ) ) | |

BEFORE: BATCHELDER, STRANCH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. One clear July day, a towboat making its way to the Mississippi River ran aground on the foot of Mud Island in Memphis, Tennessee. The vessel left large holes on Mud Island's banks. The City of Memphis and its agent, Riverfront Development, Inc., invoked the district court's admiralty jurisdiction to bring this negligence suit against Wepfer Marine, Inc., the owner of the grounded vessel. After finding Wepfer liable for the grounding, the district court awarded $1,145,990 in damages. Wepfer now challenges only the damages ruling. For the most part, we reject Wepfer's claims under our deferential standard of review. But the district court did commit one clear error in calculating the damages award. We thus reverse the judgment and remand for entry of an amended award consistent with this opinion.

No. 19-6088, *Riverfront Development, Inc., et al. v. Wepfer Marine, Inc.*

I

A

Mud Island sits in Memphis, Tennessee, where the Wolf River Harbor meets the Mississippi River. It is not in fact an island, but a peninsula running north-and-south down the Tennessee side of the Mississippi River. To the island's west lies the Mississippi River and then Arkansas; to its east lies the Wolf River Harbor and then downtown Memphis. Mud Island's undeveloped southern tip juts out where the Wolf River Harbor meets the Mississippi.

On July 6, 2015, Captain Jared LaFrance was piloting the M/V *Lucy Wepfer* southbound through the Wolf River Harbor toward the Mississippi. The *Lucy Wepfer* pushed a barge loaded with concrete slurry. LaFrance intended to make a "U-turn" and steer his vessel northward up the Mississippi River. As he entered the Mississippi, Mud Island was to his starboard (right) side. The Mississippi was high that day, and Mud Island's southern tip was submerged. LaFrance made his starboard turn into the Mississippi prematurely, and the *Lucy Wepfer* ran aground on Mud Island's submerged southern tip. In the language of admiralty law, this was an "allision," which "occurs when a moving vessel strikes a stationary object[.]" *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010). The *Lucy Wepfer* and the barge were extracted after some effort. The water's later receding revealed two large gashes on Mud Island's eastern shore.

B

Riverfront Development, Inc., Mud Island's managing agent, sued Wepfer Marine, Inc., the *Lucy Wepfer*'s owner, for negligence. Riverfront sought to recover the costs of repairing the damage to Mud Island. The City of Memphis later intervened as a plaintiff. (The distinction between the two plaintiffs does not matter on appeal so we will refer to them both as "Riverfront.")

2

The district court determined that Wepfer was fully liable and that the proper measure of damages was *restitutio in integrum*—the cost of restoring Mud Island to its previous condition. *The Baltimore*, 75 U.S. 377, 385 (1869).

The district court held a hearing to establish the cost of repairing Mud Island. Following the grounding, the Mississippi's rising and falling waters had started filling the holes with sediment. The parties disputed whether this sediment needed to be removed to restore Mud Island to its original condition. Wepfer argued that the sediment was the same material that had built Mud Island and that the river would naturally refill the holes. Alternatively, Wepfer contended that it needed only to pay to fill the holes above the sediment. Riverfront, by contrast, maintained that the accumulating sediment would not restore Mud Island to its original condition. It wanted to excavate the sediment so that the holes could be "filled and packed by human intervention with sand and/or limestone." At the hearing, then, the district court needed to resolve (a) the volume of the holes; (b) whether the sediment needed to be removed; (c) the material that should be used to fill the holes, if any; and (d) the total cost of the repairs.

1. *Volume*. The parties debated the size of the two large holes. Both sides measured the holes within eight months of each other.

James Reeder, a Riverfront project director with a bachelor's degree in civil engineering, first measured the holes in November 2016, about 16 months after the accident. Reeder explained his process. Using a "tape measure and electronic devices," he "divided the two gouges into five different areas" and then "took measurements of these five parts . . . and came up with the cubic yardage." Reeder estimated the holes' irregular depths by using "engineering judgment" and his own height as a reference. Based on rounded-up measurements, he calculated the volume of the holes as 10,000 or 10,100 cubic yards. When Reeder sought a quote for refilling the holes, he

added a 20-percent contingency to account for "compaction" of the material. This contingency was necessary, Reeder explained, "because a lot of times when you fill up holes, you have material that's not compacted and you have to buy more material than what is the volume of the hole. So when you end up compacting it, you have to have 20 percent more material to get to the final grade." That resulted in a total volume of 12,000 cubic yards of fill *material* to fill the 10,000 or so cubic yards of *holes*.

Wepfer hired Ollar Surveying Company to measure the holes again eight months later in July 2017. The court recognized Douglas Swink, the surveyor, as an expert in the fields of land surveying, topographic surveys, slope analysis, and soil analysis. Swink measured the holes using common surveyor methods. He calculated their volume as 2,792.30 cubic yards, a number that fell more than 70 percent below Reeder's. But all agreed that Ollar's measurements were more or less accurate in July 2017.

The disparities in measurements mattered greatly to Wepfer, as they suggested the amount of sediment accumulating in the holes. Wepfer tried to paint Reeder's earlier tape-measure calculations as unsophisticated and inaccurate. Even Riverfront's expert opined that it did not "seem very likely" that the holes could have filled with over 7,000 cubic yards of sediment in eight months. Benny Lendermon, Riverfront's former president and a civil engineer, also agreed that, when he saw the holes in March 2017 (after Reeder's measurements but before Ollar's), it appeared that they "had filled in very little[.]" But Riverfront's witnesses also suggested that erosion and "sloughing" (instability of the holes' slopes) could account for some of the accumulation.

2. *Excavation*. The parties next debated whether the accumulated sediment needed to be removed before refilling the holes.

Riverfront's witnesses testified that excavation was necessary because Mud Island is made of sand and the sediment accumulating in the holes was "muck." Those witnesses included Reeder; Lendermon; and Clinton S. Willson, a professor of civil and environmental engineering. Dr. Willson testified that Mud Island, in its present form, is largely made of sand. Around the turn of the twentieth century, it was little more than a sand bar. But today, he explained, it is "a highly engineered system" composed of "dredged material that was . . . placed in a way that would allow for . . . development[.]" The dredged material was mainly "granular sand" from the bottom of the Mississippi River.

While Mud Island is made of sand, Riverfront's witnesses testified that the sediment settling in the holes was likely "muck." They admitted that they did not test the sediment to determine whether it was muck or sand—the most accurate way to answer the question. But they explained why they believed it was muck. According to Dr. Willson, the Mississippi carries a range of sediments, from "large course-grain sand, down through medium, fine, very fine sand," and then "down into silts and clays[.]" The heavier sand settles near the river bottom. The finer material is no match for the Mississippi's current and so remains afloat. The Wolf River Harbor, by contrast, has little to no current. An eddy thus forms as the Mississippi's current meets the Wolf River Harbor's stagnant water. The Wolf River Harbor's lack of a current allows the Mississippi River's fine materials to settle, resulting in "more loose material"—known as "muck"—accumulating in the harbor. Because the holes were on Mud Island's harbor side, Riverfront's witnesses testified, it was highly likely that they contained the settling muck rather than sand.

Riverfront's witnesses added that muck is not a suitable replacement for sand. Dr. Willson defined muck as "typically some combination of water, mud, organic material . . . very fine

5

particles." It has very little "integrity in terms of being able to step on it, in terms of loading on top of it." He explained that "there's a big difference between the [structural] stability of the clay and the stability of the sand." Lendermon agreed, and described a riverfront development project near Mud Island in which the builders allowed "too much silty material" to mix with the sand. "[T]hat soft material there was creating a sliding plane that created no stability" and resulted in "a major failure of [a] dike."

To dispute these points, Wepfer presented evidence that Riverfront needed to undertake no excavation because the holes were filling with the same material used to build Mud Island. Dr. Charles Morris, an expert in river engineering, agreed that Mud Island had been built of dredged Mississippi River sand. But Dr. Morris believed that the sediment now filling the holes was "mostly sand," not muck. Because Mud Island sat on the outer side of a Mississippi River bend, he explained, it was more likely for sand to be deposited on the island's foot. On the bend's inner side, closer to Arkansas, the water travels at a slower rate. But the water on the bend's outer side accelerates as it travels more distance. When the water is "flowing faster," Dr. Morris explained, "it carries sand with it." In Dr. Morris's opinion, the fast-flowing water was depositing sand on Mud Island. He did not think "human intervention" was necessary to return the holes to their original condition

Riverfront called Dr. Willson in rebuttal. In his view, the higher speed in the bend creates "a corkscrew effect of the flow. So if the flow is trying to go around the bend, it's also then corkscrewing back under down to the bottom of the river." That phenomenon would push the sand away from Mud Island toward Arkansas.

3. *Materials*. The parties also debated the materials that would be suitable to refill the holes. The two options were sand ($43.50 per cubic yard) and limestone ($37 per cubic yard). In

its pretrial brief, Riverfront requested the more expensive sand. All witnesses agreed that both sand and limestone would be acceptable. A Riverfront witness, Lendermon, testified that limestone was "certainly" suitable, and that sand would be "suitable as long as you can hold it in place." Dr. Willson also thought that "some kind of construction-grade limestone" or "maybe sand" would be appropriate fill materials. He could not say that "one or the other is better." Dr. Morris, Wepfer's expert, believed limestone was "a sufficient material"; indeed, he testified that limestone would make the island "much more stable" than it was before and so "would be an enhancement to stability."

4. *Costs*. Riverfront lastly introduced the sole estimates that it had received to repair Mud Island. Luhr Brothers, Inc., estimated a cost of $623,990 for excavating 9,208 cubic yards of material. The company received that 9,208 number from Reeder. To calculate this number, Reeder started with his 12,000 cubic yard estimate—an estimate that included *both* the size of the holes that he had measured (about 10,000 cubic yards) *and* the 2,000 cubic yards worth of extra fill material needed because of compaction. Reeder then subtracted 2,792 cubic yards—the size of the hole that Ollar later measured in July 2017.

The cost estimate for refilling the holes with limestone was $444,000, while the cost to refill with sand was $522,000. These amounts were based on 22,000 tons of fill material reflecting 12,000 cubic yards—the quantity of fill that Reeder had initially calculated.

## C

The district court's damages order awarded Riverfront "the cost of excavating and refilling the depressions caused by Wepfer's negligence." It credited Riverfront's witnesses that the sediment filling the holes was "muck" and thus that Riverfront needed to excavate it. It noted that Wepfer's alternative theory that the accumulated sediment was sand did not "overwhelm[]"

Riverfront's "substantial evidence" to the contrary. The court next accepted Reeder's initial measurements as an acceptable estimate of the original size of the holes, and seemingly used Ollar's later measurements to conclude that the holes had filled with roughly 9,208 cubic yards of sediment. It also found that Riverfront had established sand as an appropriate material for refilling the holes. Finally, the court found the cost of repair to be essentially uncontradicted, and accepted Luhr Brothers' estimates. It entered a judgment awarding Riverfront $1,145,990 in damages.

Wepfer filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The court denied the motion, concluding that it sought "a wholesale relitigation of the case" and raised "no new arguments."

## II

On appeal, Wepfer challenges the district court's damages award without disputing the law that the court applied. So we may assume (without deciding) that the court properly determined that the correct measure of damages was the cost of restoring Mud Island to its prior condition. *The Baltimore*, 75 U.S. 377, 385 (1869). And we may assume (without deciding) that Riverfront needed only to prove this restoration cost "to a 'reasonable degree of certainty.'" *Nat'l Steel Corp. v. Great Lakes Towing Co.*, 574 F.2d 339, 342 (6th Cir. 1978) (quoting *Cranston Print Works Co. v. Pub. Serv. Co. of N.C.*, 291 F.2d 638, 649 (4th Cir. 1961)).

Instead, Wepfer challenges the district court's factual findings. We review "findings of fact following a bench trial in an admiralty case for clear error, construing the evidence in the light most favorable to the appellee." *F.C. Wheat Maritime Corp. v. United States*, 663 F.3d 714, 723 (4th Cir. 2011); *ConAgra, Inc. v. Inland River Towing Co.*, 252 F.3d 979, 983 (8th Cir. 2001). We must affirm the findings if they are "plausible in light of the entire record," even if we might have "weighed the evidence differently." *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 771 (6th

Cir. 2007) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574–75 (1985)); Fed. R. Civ. P. 52(a)(6). And we may reverse only if we are "left with the definite and firm conviction that a mistake has been made[.]" *Pearce v. United States*, 261 F.3d 643, 647 (6th Cir. 2001) (quoting *Graves v. United States*, 872 F.2d 133, 136 (6th Cir. 1989)).

Wepfer alleges four factual errors. It argues that the district court: (1) wrongly estimated the size of the holes in Mud Island; (2) mistakenly found a need to excavate the sediment out of the holes; (3) miscalculated the amount of sediment needed to be excavated; and (4) chose the wrong fill material. The deferential standard of review requires us to reject all but the third argument. We find that the district court committed clear error in calculating the amount of sediment to excavate. Wepfer also challenges the district court's denial of its Rule 59(e) motion, but it makes no separate argument on the merits. So our resolution of these four main issues suffices to resolve that issue.

1. *Size of Holes*. Wepfer first argues that the district court erred in crediting Reeder's measurements of the size of the holes in November 2016. To recap, the district court accepted Reeder's measurements that, as of November 2016, the holes were "roughly 10,000 cubic yards" in size. And it accepted Reeder's 20-percent "contingency" for additional material necessary to compact the holes to the final grade.

The district court's reliance on Reeder's measurements for the holes' initial size suffices to survive the clear-error standard. Reeder has a degree in engineering. Using basic tools, he took the holes' average widths, lengths, and depths, and calculated a volume of 10,000 or so cubic yards. He also explained the need for a 20-percent compaction contingency when refilling the holes. He testified that, in his judgment, the measurements were "reasonably accurate." The

9

evidence sufficed to prove the size of the holes to "a reasonable degree of certainty." *Nat'l Steel Corp.*, 574 F.2d at 343.

Wepfer's contrary arguments ask us to reweigh the evidence and reach a contrary conclusion. That is not our job on appeal. *See Harlamert*, 489 F.3d at 771. Wepfer argues that Reeder simply "ballparked" his estimate of about 10,000 cubic yards, using unsophisticated tools and calculations. Wepfer contrasts Reeder's approach with Ollar's measurements, which used standard surveying techniques to reach a much lower estimate of 2,972 cubic yards. And Wepfer points to evidence suggesting that it was unlikely that the holes had filled with nearly 7,000 cubic yards of sediment between the two measurements. Yet, invoking Tennessee law for this admiralty case, Wepfer concedes that Riverfront needed only to present "substantial evidence" to allow the district court to make a "fair and reasonable assessment of the amount of damages." Apt. Br. 19 (quoting *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 602 (6th Cir. 1987)). Reeder's measurements meet that substantial-evidence requirement. While we might not have taken the same view of the facts, we cannot say the district court's finding was clearly erroneous.

2. *Need for Excavation*. Wepfer next argues that the district court erred in crediting the testimony from Riverfront's witnesses that accumulated sediment must be excavated to restore Mud Island to its original condition. There was no clear error. To begin with, both parties' witnesses agreed that Mud Island is largely made of dredged sand. And Riverfront presented uncontradicted evidence that river muck is not a suitable replacement for sand. So the parties disputed only whether the sediment accumulating in the holes was sand (suitable) or muck (not suitable).

Riverfront presented enough evidence for the court to find that the holes were mostly filling with muck, not sand. Dr. Willson opined as to this fact and gave a reasoned explanation why—

because the Wolf River Harbor was mostly filled with muck and the holes were on the harbor side. His expert opinion, rooted in his understanding of river dynamics, comported with Lendermon's practical experience. In Lendermon's experience from other projects, the material in the mouth of the Wolf River Harbor is "unsuitable" muck. The district court could rationally credit Dr. Willson's explanation as "persuasive" and could rationally conclude that Lendermon's testimony lent "further credibility" to those expert views. We treat these credibility findings with great deference. *See* Fed. R. Civ. P. 52(a)(6); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 674 (6th Cir. 2008). The district court thus had "sufficient" evidence to make a "just and reasonable" determination that the holes required excavation before refilling. *Nat'l Steel Corp.*, 574 F.2d at 342.

Wepfer's counterarguments lack merit. It argues that the district court's ruling was improperly speculative because Riverfront never tested the sediment. To be sure, Dr. Willson and Lendermon admitted that they did not know the holes' contents with absolute certainty. But their opinions were far from "speculation or guesswork." *See id.* They were rooted in understanding of, and experience with, the Mississippi River. As Lendermon explained, there were two ways to determine the makeup of the accumulated sediment: to test it or to know "how it got there." While the first approach would provide greater clarity, the second approach, on this record, was sufficient for the district court to reach a reasonably certain conclusion. *Cf. ConAgra*, 252 F.3d at 985.

Wepfer next points to contrary evidence. It cites Dr. Morris's opinion, for example. But "when a trial judge's finding is based on [the] decision to credit the testimony of one or two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Madden*, 549 F.3d at 674 (quoting *Anderson*, 470 U.S. at 575). Wepfer also cites

the observation from Ollar's surveyor (Swink) that the holes contained material like the undamaged portions of Mud Island. As the district court elsewhere found, however, "collapse of other parts of the island" could account for some of the material in the holes. The court's excavation finding was not clearly erroneous.

*3. Amount of Excavation.* Wepfer argues that the district court erred in its calculation of the volume of sediment to be excavated. It has a point. Recall that Reeder measured the size of the holes as 10,000 or 10,100 cubic yards, but added a 20-percent "contingency" to account for the extra fill material that Riverfront would need to compact the holes to grade level. When Riverfront sought a quote for *refilling* the holes, it used this 12,000-cubic-yard figure. It also used that same enhanced figure (12,000, not 10,000) when later seeking a quote for *removing* the accumulated sediment from the holes. It asked Luhr Brothers to price out the excavation of 9,208 cubic yards of sediment. Riverfront reached the 9,208-cubic-yard figure by taking the difference between Reeder's enhanced estimate (12,000 cubic yards) and Ollar's later measurement (2,792 cubic yards). And the district court awarded Riverfront $623,990, the cost of removing 9,208 cubic yards of material. The court clearly erred in calculating the amount to be excavated as 9,208 cubic yards.

The error comes from accepting the 12,000 cubic yards as the baseline size of the holes for *excavation* purposes, when that figure included roughly 1,900 to 2,000 extra cubic yards of material for *filling* purposes. By Reeder's own telling, the compaction contingency for filling a hole represents "more material than what the volume of the hole indicates[.]" He later repeated this explanation, saying that "when you fill up holes, you have material that's not compacted and you have to buy more material than what is the volume of the hole." So using the compaction-enhanced volume for excavation overestimates the actual size of the holes, which were only 10,000

or so cubic yards by Reeder's own telling. Reeder himself seemed to concede during cross-examination that the compaction number should *not* be used to calculate the excavation number. When Wepfer's attorney asked him to explain why "the 20 percent compaction figure" should be used to calculate the excavation amount, Reeder replied: "I didn't say it would." And Riverfront has identified no other evidence supporting the use of this 12,000-cubic-yard figure for excavation purposes. Given Reeder's own explanation and the lack of other evidence, we have a "definite and firm conviction that a mistake has been made" on this calculation. *Pearce*, 261 F.3d at 647 (quoting *Graves*, 872 F.2d at 136).

The true excavation volume likely should have been about 7,208 cubic yards (the "roughly 10,000 cubic yards" found by the district court, less 2,792). Ollar's estimate included $60,000 in fixed costs, plus variable costs based on excavation volume, with a multiplier of $61.25. *See* Exhibit 25. Plugging in the new volume results in a total excavation cost of $501,490, which would reduce the damages award by roughly $122,500. Yet the district court did not precisely identify the actual size of the hole that Reeder measured. The court described Reeder's estimate as "roughly 10,000 cubic yards" based on his testimony that "I believe the number was 10,000 cubic yards, 10,100 cubic yards." We will leave it to the district court to recalculate the proper number on remand without the use of any compaction contingency.

Riverfront makes no argument to justify the use of the larger 12,000-cubic-yard number. It claims that Wepfer's "arguments on this finding are tethered to its position that Mr. Reeder's volume measurements were incorrect." Ape. Br. 29. Not so. Wepfer makes this argument "without waiving its [separate] argument that Reeder's volume estimate [was] so exaggerated as to render it incredible[.]" Apt. Br. 29–30. One can fully accept that Reeder correctly calculated the size of the hole as roughly 10,000 cubic yards in volume and also conclude that the 2,000 cubic

yards in compaction volume should not be used to calculate the excavation volume. Riverfront also portrays the 9,208-cubic-yards figure as "consistent with all [the district court's] other findings," including "that the volume of the land gouged out measured 12,000 cubic yards." Ape. Br. 29–30. That is mistaken. The district court found that Reeder had calculated an *actual* volume of "roughly 10,000 cubic yards," and separately allowed the 20-percent "contingency for compression of the material." The district court gave no explanation as to why the contingency should also apply to determine the amount of excavation needed, and we have found no evidence in the record that would suggest the contingency should have carried over in this way.

4. *Material to Use*. The district court lastly did not clearly err in concluding that "sand would be an appropriate material to refill the depressions." Several witnesses testified that sand would restore Mud Island to its original condition.

In response, Wepfer points to evidence suggesting both that limestone was an acceptable (or even preferable) material and that it was cheaper. But Wepfer asserts no legal argument that Riverfront had any admiralty-based duty to mitigate damages by picking that alternative. And the district court could reasonably require the same material that was used to create Mud Island.

For these reasons, we reject all of Wepfer's arguments save one. We hold that the district court clearly erred when it calculated the excavation amount. We reverse the district court's judgment and remand for entry of an amended damages award consistent with this opinion.